**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Frank J. KUTA, Defendant-Appellant.**

**No. 74–1920.**

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1975.

Decided June 30, 1975.

Rehearing Denied July 29, 1975.

---

Before CASTLE, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

CASTLE, Senior Circuit Judge.

Defendant Frank J. Kuta, alderman of the twenty-third ward of the City of Chicago, Illinois from 1967 to 1971, was convicted by a jury on Counts II, IV, and IX of a ten-count indictment. Subsequently, the trial court acquitted the defendant on Count IV. Count II charged the defendant with extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a), (b)(2),[1] and Count IX charged the defendant with the making of a false statement on his federal income tax return in violation of 26 U.S.C. § 7206(1).[2] From his convictions on Counts II and IX, the defendant appeals. We affirm.

## I.

### A.

Count II charged the defendant with obstructing, delaying and affecting commerce by obtaining $1500, not due either him or his office, under color of official right. The indictment further specified that the payment was made because Sam Vanchieri, a realtor, "believed and feared that he would be unable to procure a zoning change on property . . . in the Twenty-third Ward of Chicago, unless he compensated defendant to re-

Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, and Michael D. Groark, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

1. That section provides in part:

   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

   (b) As used in this section—

   &ast; &ast; &ast; &ast; &ast; &ast;

   (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

   &ast; &ast; &ast; &ast; &ast; &ast;

2. That section provides in part:

   Any person who—

   (1) *Declaration under penalties of perjury.*—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;

   . . .

   &ast; &ast; &ast; &ast; &ast; &ast;

   shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.

frain from objecting to such a change as a member of the Chicago City Council . . . ."

Viewed in the light most favorable to the Government, the evidence shows that Vanchieri believed that the alderman of the ward must approve zoning changes. In an attempt to have property that he owned in the twenty-third ward rezoned, Vanchieri contacted the defendant. At this initial meeting, Kuta told Vanchieri that he had no objection to the proposed zoning change. Nothing more was said. Vanchieri then filed an application for a zoning change, and on November 17, 1969 the requested amendment was passed by the full City Council, alderman Kuta voting in favor of the amendment.

On December 1, 1969 the defendant telephoned Vanchieri and asked to see him. Vanchieri responded that he would be right there. He then put a blank check in his pocket and went to Kuta's office. When he arrived, Vanchieri initiated the conversation by asking how much he owed. He asked that question because, in light of Kuta's telephone call, he "thought [he] owed him something for not objecting to the zoning." In response to Vanchieri's question, Kuta replied "$1500." Vanchieri made out the blank check that he had brought payable to himself, endorsed it, gave it to the defendant, and then left the office.

As a result of the zoning change, Vanchieri constructed three buildings on his newly zoned lots using materials transported in interstate commerce.[3]

The defendant's first attack on his convictions is that the evidence is insufficient to establish the two essential elements of the Hobbs Act offense charged here: interference with commerce, and extortion. Stirone v. United States, 361

U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Considering first the element of extortion, the type of extortion charged here was the "obtaining of property from another, with his consent, induced . . . under color of official right." 18 U.S.C. § 1951(b)(2). In United States v. Braasch, 505 F.2d 139, 151 (7th Cir. 1974), cert. denied 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975), we explained:

> The use of office to obtain payments is the crux of the statutory requirement of "under color of official right" . . . . So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951.

■ The evidence here is sufficient to show that it was Kuta's office that brought forth Vanchieri's payment, and that therefore the defendant committed extortion. Vanchieri believed that the alderman must approve zoning changes, the approval taking the form of not objecting to the proposed change. In addition to Vanchieri's belief, the record shows that persons contacted the defendant about zoning problems,[4] and a realtor, Irwin Michaels, testified that he discussed payments for zoning changes with the defendant.[5] The jury could conclude from this evidence that as alderman the defendant exercised power over zoning amendments, and that the payment by Vanchieri was made to influence that aldermanic power. See United States v. Staszcuk, 502 F.2d 875, 878 (7th Cir. 1974), rev'd in part on other grounds en banc, 517 F.2d 53 (1975).

■ Turning to the interstate commerce element, there was evidence that buildings constructed on the rezoned

---

3. It was stipulated that the furnaces and electrical apparatus used in the buildings were purchased from local suppliers whose inventories were composed of shipments from out of state manufacturers. It was also stipulated that as the inventory is depleted, additional inventory must be ordered by the local suppliers from the out of state manufacturers.

4. Mary Mager and Bernadine Seguin testified that they contacted the defendant for aid in

rezoning property for single family dwellings, and Mager also testified that the defendant agreed to help.

5. This evidence was admitted under the similar acts doctrine, and no error as to its admissibility is raised on appeal.

property could not have been constructed under the pre-existing zoning, and it was stipulated that those buildings contained materials that had moved in interstate commerce. *See* note 3 *supra*. Clearly, this is adequate to show that the rezoning affected interstate commerce by facilitating the flow of building materials across state lines. United States v. Staszcuk, *supra*, at 878 & n.8. The defendant argues, however, that the evidence is insufficient to show that the rezoning was procured by the extortion, and therefore, that the extortion affected commerce.

■ Contrary to the defendant's contention, the evidence supports a conclusion by the jury that the zoning change was procured because the defendant agreed not to exercise his independent judgment on the merits of that change in return for payment. Although the payment occurred after the zoning amendment was passed, and the evidence does not indicate that prior to its passage payment was explicitly discussed, the jury could infer that an agreement existed from the fact that payment was expected by the defendant, and that Vanchieri so understood. Kuta's telephone call sparked Vanchieri to bring a blank check to the defendant's office, and to initiate the conversation by asking how much he owed. The testimony shows that Kuta did not express any surprise at this question, nor did he ask Vanchieri what he meant, but simply and tersely responded "$1500." This expectation of payment, further strengthened by Vanchieri's reasons for making the payment, supports a finding that there existed a tacit understanding according to which the defendant refrained from objecting to the zoning amendment in return for a subsequent payment of money, and that this restraint affected the passage of the amendment. Consequently, the jury could find that the extortion affected commerce, and that the defendant thereby violated the Hobbs Act.

### B.

The defendant timely objected to the trial court's instruction on the commerce element of the Hobbs Act. The instruction charged the jury that commerce was affected as a matter of law if they found beyond a reasonable doubt that certain facts occurred.[6] The defendant contends that the instruction was erroneous because it is the jury's function to determine whether interstate commerce is affected. He asserts that the result of the court's instruction was to impermissibly direct a verdict on that issue.

■ We were faced with a similar contention in United States v. Green, 246 F.2d 155 (7th Cir.), cert. denied 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957). We held there that:

It was clearly the function of the court to determine whether interstate commerce was affected and whether the court had jurisdiction under the Act. As stated in Hulahan v. United States, [214 F.2d 441, 446 (8th Cir.) cert. denied 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954)]: "We think it was for the court, and not the jury, to determine whether the Government's evidence, if believed, would bring the activities of the defendant within the

6. The instruction read as follows:

Whoever, in any way or degree, obstructs, delays or affects commerce or the movement of any article or commodity in commerce by extortion violates the law.

\* \* \* \* \* \*

In reference to the statutory requirement of the law that commerce be affected, you are instructed as a matter of law that there was such an effect on interstate commerce and the necessary Federal jurisdiction element is satisfied. . . .

In respect to Count 2, if you find beyond a reasonable doubt that materials used in the construction or furnishing of buildings constructed in 1970 at 5316, 5318 and 5322 South Kilbourn Avenue, Chicago, Illinois, were manufactured or shipped from outside the State of Illinois, and that the buildings which were built on that Kilbourn Avenue property could not have been built under the pre-existing zoning ordinance.

statute and sustain federal jurisdiction." See also Nick v. United States, 8 Cir., 122 F.2d 660, 673, 138 A.L.R. 791.

*Id.* at 160–161.

Similarly, in United States v. Hyde, 448 F.2d 815, 839 & n.34 (5th Cir. 1971), cert. denied 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), the court, after a comprehensive review of the case law, concluded that it was for the jury to determine if the facts occurred, but that the trial court should determine if commerce was affected.

■ The defendant's argument fails to draw the distinction between factual determinations which the jury must make, and the legal impact of those determinations which the trial court is competent to evaluate. The cases on which the defendant relies are inapposite because the instructions in those cases pre-empted jury determinations of factual issues.[7] Here, however, the instruction clearly left the factual issues for the jury, and thus we find no error.

■ The defendant also contends that the instruction was erroneous because it failed to include a definition of commerce. A definition was not necessary, however, because what constitutes interstate commerce and whether it was affected were matters of law that the trial court resolved. The instruction was proper.

## II.

■ The defendant was a member of the law firm of Kash and Kuta. Prior to trial, a subpoena was issued directing the defendant to produce "[a]ll partnership books and records for the partnership of Kash and Kuta for the years 1965 through and including 1970." The defendant moved to quash the subpoena, arguing that it violated his Fifth Amendment privilege against compulsory self-incrimination. The Government, seeking only the partnership's financial records, supports the issuance of the subpoena by relying on Bellis v. United States, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), and the defendant, in turn, contends that he falls outside the scope of that decision.[8]

In *Bellis,* the Court held that a former partner of a small, three-partner Pennsylvania law firm could not invoke his privilege against self-incrimination to justify a refusal to comply with a subpoena requiring production of that partnership's financial records. The Court's holding was structured from the underlying consideration that the privilege is a purely personal one, applying only to an individual's own words and papers, and that consequently, an individual cannot rely on the privilege to avoid producing the records of a separate collective entity. From this base, the Court then went on to determine that a partnership may have an independent organizational identity apart from its individual partners, and found that in the circumstances of the case before it, the three-member partnership did have such an existence. Finally, the Court concluded that the particular financial records in issue were partnership records, and that they were

---

7. *See e. g.,* United States v. Skinner, 437 F.2d 164 (5th Cir. 1971); United States v. Raub, 177 F.2d 312 (7th Cir. 1949); United States v. Gollin, 166 F.2d 123 (3d Cir.), cert. denied 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151 (1948).

8. As was the subpoena in *Bellis,* the subpoena here was broadly worded. *See* 417 U.S. at 86, 94 S.Ct. 2179. In the hearing before the trial court on the motion to quash, the defendant attacked the scope of the subpoena, and government counsel in response stated that "it calls generally for financial records." Further, the Government's trial brief in opposition to the motion to quash states that "[w]e are seeking here only those financial documents which indicate the fees received by the partnership for doing legal work for clients." There is no indication that any other type of partnership records were produced in response to the subpoena or introduced at trial. Accordingly, we narrowly view the subpoena as requiring only the production of financial records. Therefore, as in *Bellis,* we are not faced with the situation where the partnership records and files produced contain work performed on behalf of clients. *See* 417 U.S. at 87 n.1, 98 n.9, 94 S.Ct. 2179.

therefore held in a representative, rather than a personal, capacity. As a result, the privilege was not available to the partner against whom the subpoena was directed.

We believe that *Bellis* controls the situation here. First, while there is variation from the factors relied on in *Bellis,* see 417 U.S. at 95–97, 94 S.Ct. 2179, we nonetheless are convinced that the evidence shows a partnership having an independent identity apart from its two individual practitioners. The association of Kash and Kuta was not temporary, the association having formed in 1963. Although there was no formal partnership agreement, the income of the firm, which included Kuta's aldermanic salary and expense allowance, was divided equally, and expenses were also shared.[9] While each practitioner individually recorded fees received in a cash receipts journal, each had access to the journal, and custody of the journal generally depended on who made the last entry. The firm of Kash and Kuta prepared partnership tax returns from the journal. Further, the firm employed two full time secretaries who did work for both members of the firm, and another lawyer was engaged for a short duration. Additionally, one of the full time secretaries could sign "office account" checks.

Moreover, "equally important," *id.* at 97, 94 S.Ct. 2179, is the fact that the financial records cannot be considered personal records to which the privilege would attach because there could be no expectation of privacy with respect to those records. In discussing one of the reasons behind the unavailability of the privilege to an individual seeking to withhold records of an artificial organization, the Court stated:

> The Court's decisions holding the privilege inapplicable to the records of a collective entity also reflect a second, though obviously interrelated policy underlying the privilege, the protection of an individual's right to a " 'private enclave where he may lead a private life.' " . . .
>
> But a substantial claim of privacy or confidentiality cannot often be maintained with respect to the financial records of an organized collective entity. Control of such records is generally strictly regulated by statute or by the rules and regulations of the organization, and access to the records is generally guaranteed to others in the organization. . . . And here lies the modern-day relevance of the visitorial powers doctrine relied upon by the Court in *Wilson* [Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911)] and the other cases dealing with corporate records; the Court's holding that no privilege exists "where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the [state]," 221 U.S., at 382, 31 S.Ct., at 545, can easily be understood as a recognition that corporate records do not contain the requisite element of privacy or confidentiality essential for the privilege to attach.

*Id.* at 91–92, 94 S.Ct. at 2184.[10]

---

**9.** Like Pennsylvania, Illinois has adopted the Uniform Partnership Act. Ill.Rev.Stat. ch. 106½, §§ 1–43. Under that Act, § 7(4) provides:

> The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business . . . .

**10.** Similarly, in Couch v. United States, 409 U.S. 322, 335–336, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973), where it was held that a taxpayer may not invoke the privilege against self-incrimination to prevent the production of business and tax records in the possession of the taxpayer's accountant, the Court stated:

> . . . [T]here can be little expectation of privacy where records are handed to an accountant, knowing that mandatory disclosure of much of the information therein is required in an income tax return. . . . Petitioner seeks extensions of constitutional protections against self-incrimination in the very situation where obligations of disclosure exist and under a system largely dependent upon honest self-reporting to survive. Accordingly, petitioner here cannot reasonably claim, either for Fourth or Fifth Amendment purposes, an expectation of protected privacy or confidentiality. (Footnote omitted.)

Accordingly, in concluding that the partner held the subpoenaed records in a representative capacity, the Court primarily relied on Pennsylvania partnership law which provides, *inter alia,* that: partners are accountable to the partnership as fiduciaries; that partners have the right of access and inspection of partnership books; and that partners have a right to formal accounting as to partnership affairs. *Id.* at 98–99, 94 S.Ct. 2179.

As noted previously, Illinois has adopted the Uniform Partnership Act, *see* note 9 *supra,* and the Pennsylvania provisions relied on by the Court find their identical counterparts in the Illinois statute. *Compare* Pa.Stat.Ann. tit. 59, §§ 51–56 *with* Ill.Rev.Stat. ch. 106½, §§ 18–23. Consequently, as in *Bellis,* the records sought here could not be considered personal records to which the privilege would attach.

In light of the above, the defendant was obligated to comply with the subpoena for the partnership records despite the fact that they may have incriminated him. The subpoena did not violate the defendant's privilege against self-incrimination because the privilege was inapplicable.[11]

### III.

The defendant argues that he was deprived of a fair trial by government counsel's prejudicial conduct during closing argument. He argues that the closing argument was improper because government counsel: (1) read from the trial transcript; (2) stated to the jury that witness Vanchieri "told you the truth;" and (3) made various misstatements of fact.

First, the defendant argues that reading from the trial transcript is improper because it unduly emphasizes selected portions of the evidence. In a similar situation, however, it is recognized that it is within the discretion of the trial court whether to read portions of the trial transcript back to the jury at its request. United States v. McCoy, 517 F.2d 41, at 44 (7th Cir. 1975); Stone v. United States, 506 F.2d 561, 564 (8th Cir. 1974). The concern for undue emphasis is even less where the reading occurs in the context of closing arguments which review the entire evidence for the jury. Further, there is no reason to establish a *per se* rule penalizing accuracy, thereby putting a premium on counsel's memory. *See* Byrnes v. United States, 327 F.2d 825, 840 (9th Cir.), cert. denied 377 U.S. 970, 84 S.Ct. 1652, 12 L.Ed.2d 739 (1964). Consequently, we think it is also within the discretion of the trial court whether to permit counsel to read from the trial transcript during closing argument.[12] Here, the trial transcript excerpts read were short and accurately quoted, and there was no abuse of discretion.

Second, the defendant contends that government counsel, by stating to the jury that Vanchieri "told you the truth," improperly placed before the jury his own credibility and also implied knowledge of evidence that was unavailable to that body. We agree that if this occurred, there would be error. United States v. Handman, 447 F.2d 853, 856 (7th Cir. 1971). That, however, is not the case here. Government counsel's remark was made after arguing that evidence which the defendant contended contradicted a prior statement made by

11. The defendant argues that this case is distinguishable from *Bellis* because a trial subpoena is involved. The availability of the privilege, however, is independent of the stage to which proceedings directed at the individual have advanced. *See* 417 U.S. at 97 n.8, 94 S.Ct. 2179.

12. We therefore disagree with the apparent adoption by Illinois of a rule prohibiting transcript reading during closing argument. People v. Willy, 301 Ill. 307, 328, 133 N.E. 859, 868 (1921); People v. Hoggs, 17 Ill.App.3d 67, 70, 307 N.E.2d 800, 802 (1974). Other courts, however, have committed the matter to the trial court's discretion. *See, e. g.* Floen v. Sund, 255 Minn. 211, 218, 96 N.W.2d 563, 568 (1959); Randall v. Steelman, 294 S.W.2d 588, 594 (Mo.App.1956); Douglas v. Duvall, 5 Utah 2d 429, 431, 304 P.2d 373, 374 (1956).

Vanchieri was, in fact, consistent with that statement. Thus, government counsel's remark that Vanchieri's prior statement was truthful derived solely from a comparison of the evidence before the jury, and therefore it did not put his credibility in issue or carry any inference of outside knowledge. United States v. Carzoli, 447 F.2d 774, 781 (7th Cir. 1971), cert. denied 404 U.S. 1015, 92 S.Ct. 673, 30 L.Ed.2d 662 (1972).

■ Finally, the defendant asserts that in four instances in closing argument government counsel made serious misstatements of the evidence. As to three of these instances, we find there to be no misstatements at all, but only legitimate argument based on evidence before the jury. Government counsel cannot be limited to a sterile recitation of uncontroverted facts. United States v. Greene, 497 F.2d 1068, 1085 (7th Cir. 1974). The only actually erroneous statement made by government counsel was that the defendant was not indicted on the Irwin Michaels transaction, *see supra* at page 950 & n.5, because the statute of limitations had run. That mistake, however, was completely rectified by the trial court's strong curative instruction.[13]

### IV.

Count IX of the indictment, charging the defendant with making a false statement on his federal income tax return, was based on the failure of the defendant to report the $1500 paid to him by Vanchieri for the zoning change. He does not attack his conviction on that Count except insofar as to contend that if the evidence is found to be insufficient to show Hobbs Act extortion, then his false statement conviction must also fall. That not being the case, and there being no other error, the finding of guilty on Count IX must stand.

The convictions on Counts II and IX are

Affirmed.

---

13. That instruction stated:

During the closing argument for the Government, reference was made to the so-called statute of limitations. The statute of limitations applicable to the type conduct charged here is a five-year period, and if, as Michaels testified, a conversation did occur in 1968 or early 1969, the statute of limitations would not have run for a corresponding period of time, that is to say, until late 1973 or early 1974.