UNITED STATES of America,
Plaintiff-Appellee,

v.

Judge Eathel GATES, Jr.,
Defendant-Appellant.

No. 79–1496.

United States Court of Appeals,
Ninth Circuit.

March 12, 1980.

Rehearing Denied May 1, 1980.

John P. Fagden, Las Vegas, Nev., for defendant-appellant.

Lawrence R. Leavitt, Asst. U. S. Atty., Las Vegas, Nev., for plaintiff-appellee.

Before MERRILL and CHOY, Circuit Judges, and EAST,* District Judge.

* Honorable William G. East, Senior United States District Judge of the District of Oregon, sitting by designation.

MERRILL, Circuit Judge:

Appellant was convicted, following jury trial, of 64 counts of extortion, in violation of the Hobbs Act, Title 18 U.S.C. § 1951; of obstruction of justice; and of giving false testimony before a grand jury.

At the time of the charged offenses, appellant was director of the Clark County, Nevada, Business License Bureau and, as such, was an officer of the Clark County Sheriff's Department. It was the function of the Bureau to issue business licenses to those seeking to do business in the unincorporated areas of Clark County. Appellant, as director, was required to review all license applications for final approval, and had the authority himself to issue "non-privileged" licenses—those not requiring approval of the county commissioners.

The companies from which he was charged with extorting funds were Motel Development, Inc. (MDI), and Royal Reservations, Inc. (Royal). Both companies were operated by David Bliss, the government's principal witness.

MDI was in the business of soliciting prospective customers to attend sales presentations in Las Vegas, Nevada, put on by other companies, for which service MDI received commissions. Prior to the offenses here charged, MDI had solicited attendance at sales presentations for a land sales company, Cavanaugh Communities (Cavanaugh), which had been forced to discontinue business in Las Vegas. The company had been subjected to a county tax of 1 percent of gross sales, plus $3 for each couple attending its sales presentations. Bliss believed that it was this tax burden that had caused Cavanaugh's failure. The offenses here charged with reference to MDI related to its solicitations on behalf of Caribbean International Corporation (CIC), which sold vacation plans—one or two weeks a year in one of its Nevada resorts for a period of 40 years. MDI conducted its solicitations from booths set up in hotels, motels and casinos within the greater Las Vegas area. At the time of the charged offenses, CIC was not subject to the county tax that had been imposed on Cavanaugh.

Royal was engaged in the business of selling show tickets to live stage productions held in Las Vegas. It also conducted its business from booths set up in various locations.

MDI and Royal were required by law to obtain a business license (non-privileged) for each one of their booths. Zoning ordinances required that the show-ticket sales booths be located in hotels or motels of 50 or more rooms, and that a conditional use permit be obtained for any booth where couples would be solicited to attend sales presentations.

Bliss believed that appellant, as director of the Licensing Bureau, and through his connections with the county commissioners, could control whether or not a tax similar to the one imposed on Cavanaugh would be imposed on CIC. Bliss believed that such a tax would probably close the business down. "I felt that he [appellant] had the powers of life or death over this type of operation."

Bliss and appellant were friends of long standing and often had lunch together. From the time CIC started its vacation plan business in Nevada, Bliss and appellant apparently discussed at several of the lunches the fact that CIC would prove very profitable if no tax were imposed. Bliss testified:

"A. Well, I had discussions with Mr. Gates that if there were no law imposed this company [CIC] would make a lot of money. I know I had that type of discussion with Mr. Gates.

Q. When?

A. It would have been right from the beginning, you know."

In the course of one of these discussions Bliss told appellant he would give him $1 on every couple Bliss referred to CIC. When Royal commenced its business in 1976, Bliss told appellant that Royal would give him 25¢ for every ticket sold. Payments thereafter from both companies were regularly made and were accepted by appellant. All told, in less than three years, payments from MDI and Royal to appellant exceeded $137,000.

Bliss testified as to his purpose in making the payments that he believed that as long as they were being made he would never have any problems in operating his business; that appellant in his official capacity would not stand in his way. His expectations were borne out. Royal was allowed to sell tickets at locations in violation of zoning laws, although Bureau investigators had brought the matter to appellant's attention. MDI was permitted to open its booths without obtaining a conditional use permit, as required, and thus without encountering the six week's delay usually faced in applying for and securing a permit. No county tax ever was imposed on CIC.

Some time later another conversation took place between Bliss and appellant. One or the other mentioned how well MDI was doing, and appellant asked if the payment couldn't be raised to $1.50 on each couple referred to CIC. Bliss agreed. In 1977, another raise in payments occurred. Bliss testified that appellant had commented on the fact that MDI was doing a big business and that if a county tax were to be imposed it could come to $40,000 per month. Bliss raised the payments to appellant to a flat $5,000 a month.

In May, 1978, Bliss received a subpoena to appear and testify before the federal grand jury. Bliss went to appellant to discuss the matter. Appellant told Bliss to tell the grand jury that the checks were for work done by appellant's wife and for accounting services and advice respecting tax shelters given by appellant's accountant. No such services or advice had ever been given. Bliss thereafter appeared before the grand jury and testified falsely along the lines suggested by appellant.

In September, 1978, appellant appeared before the grand jury and testified that neither he nor any member of his family had ever received anything from Bliss, directly or indirectly, in return for favorable treatment with respect to business licenses.

1. *Extortion*

The Hobbs Act, Title 18 U.S.C. § 1951, provides in part:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do * * * shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

\*     \*     \*     \*     \*     \*

(b) As used in this section—

\*     \*     \*     \*     \*     \*

(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

Appellant first contends that the facts do not show any effect upon interstate commerce. We disagree. The extortion of money from an interstate business, thus depleting its funds, suffices. *United States v. Phillips*, 577 F.2d 495 (9th Cir. 1978). Here MDI and Royal were engaged in soliciting tourists (MDI's commissions from CIC only applied in the case of out-of-state residents). There can be no question that both businesses were closely connected with and dependent upon the interstate travel of vacationers.

The charged extortion was the obtaining of money from MDI and Royal, induced under color of official right. Appellant contends that the required inducement on his part was not proven here; that no evidence was offered to show that he initiated or induced the payments. This contention is arguable with regard to the original payments of $1 per couple. It is incorrect as to the increased payments. Those clearly were induced by appellant. Even as to the original payments, however, sufficient inducement by appellant appears.

In *United States v. Hathaway*, 534 F.2d 386 (1st Cir. 1976), defendants were charged with extorting money from Meridian Engineering, Inc., in return for the awarding of two contracts by the New Bedford, Massachusetts, Redevelopment Authority. Graham, president of Meridian, testified that he offered money to defendant Baptista,

believing that without such payment his company would not get the contract on a particular Authority project. The offer was accepted, and Graham was told what procedure to follow in making payment. The procedure was followed, and Meridian was awarded the contract by the Authority. Baptista later informed Graham of another project, and the same steps were followed: offer, acceptance, payment, and award of contract. Defendants contended that "the mere passive receipt of money" (534 F.2d at 393) was not sufficient to constitute a violation. The court rejected the contention, holding:

> "To be sure, on both occasions, Graham himself may have first brought up the subject of payments. But the jury could find that the impetus came from a reasonable apprehension that, without paying, Meridian would not be considered by the Authority. Baptista's exploitation of such a fear amounted to extortion notwithstanding Graham's readiness and even eagerness to play the game. *See United States v. Kahn, supra,* 472 F.2d [272] at 277–78."

534 F.2d at 395.

To the same effect is *United States v. Kuta,* 518 F.2d 947 (7th Cir. 1975). There the court stated the facts as follows:

> "Viewed in the light most favorable to the Government, the evidence shows that Vanchieri believed that the alderman of the ward must approve zoning changes. In an attempt to have property that he owned in the twenty-third ward rezoned, Vanchieri contacted the defendant. At this initial meeting, Kuta told Vanchieri that he had no objection to the proposed zoning change. Nothing more was said. Vanchieri then filed an application for a zoning change, and on November 17, 1969 the requested amendment was passed by the full City Council, alderman Kuta voting in favor of the amendment.
>
> On December 1, 1969 the defendant telephoned Vanchieri and asked to see him. Vanchieri responded that he would be right there. He then put a blank check in his pocket and went to Kuta's office. When he arrived, Vanchieri initiated the conversation by asking how much he owed. He asked that question because, in light of Kuta's telephone call, he 'thought [he] owed him something for not objecting to the zoning.' In response to Vanchieri's question, Kuta replied '$1500.' Vanchieri made out the blank check that he had brought payable to himself, endorsed it, gave it to the defendant, and then left the office."

518 F.2d at 950.

The court held:

> "Although the payment occurred after the zoning amendment was passed, and the evidence does not indicate that prior to its passage payment was explicitly discussed, the jury could infer that an agreement existed from the fact that payment was expected by the defendant, and that Vanchieri so understood. * * * This expectation of payment, further strengthened by Vanchieri's reasons for making the payment, supports a finding that there existed a tacit understanding according to which the defendant refrained from objecting to the zoning amendment in return for a subsequent payment of money, and that this restraint affected the passage of the amendment."

518 F.2d at 951.

■ In our case, Bliss's testimony respecting his conversations with appellant was not clear as to who said what, and who brought up what subject. However, from the testimony the jury could have found that Bliss believed that appellant's official assistance, particularly with respect to the imposition of a county tax, was necessary to the success of his operations; that appellant was aware of Bliss's belief in this respect; that an understanding was reached between the two that appellant would use his influence to prevent a county tax from being imposed and otherwise would seek to smooth the way for Bliss's operations and that this understanding was invited by appellant. We hold that this suffices to constitute inducement.

We find no merit in appellant's contentions that it was error to refuse to give certain instructions respecting use permits or the 50-room requirement of the booth locations. The testimony did not warrant the giving of such instructions.

### 2. *Obstructing Justice*

Appellant contends that in providing Bliss with a false story to give to the grand jury he lacked the specific intent to impede the administration of justice which is required by *United States v. Ryan*, 455 F.2d 728 (9th Cir. 1971). We disagree.

Such an intent clearly appears. Impeding the administration of justice by affording himself protection against criminal liability was obviously appellant's purpose.

### 3. *False Grand Jury Testimony*

Appellant testified before the grand jury that he had never received money from Bliss for favorable treatment with respect to business licenses. He contends that there is no evidence that the sums he received were specified to be in connection with licensing.

It is true that Bliss did not testify that favorable treatment respecting licensing was specified when payment was offered. However, as the government asserts, the evidence that favorable treatment was received by the companies was overwhelming. They were favored over competitors in many ways, including the granting and timing of license and permits. The jury could hardly escape the conclusion that such treatment was the result of the payments.

Judgment affirmed.