**UNITED STATES of America, Appellant,**

v.

**R. C. FRENCH, Appellee.**

**No. 80–1096.**

United States Court of Appeals, Eighth Circuit.

Submitted May 22, 1980.

Decided Aug. 7, 1980.

Rehearing and Rehearing En Banc Denied Aug. 28, 1980.

Certiorari Denied Nov. 3, 1980.

See 101 S.Ct. 364.

Stephen B. Higgins, Asst. U. S. Atty., St. Louis, Mo., argued, for appellant; Robert D. Kingsland, U. S. Atty., and Timothy J. Wilson, Asst. U. S. Atty., St. Louis, Mo., on brief.

Ronald J. Kaden, Clayton, Mo., argued, for appellee; Charles M. Shaw, University, Mo., on brief.

Before BRIGHT, HENLEY and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

The United States appeals from an order of the district court setting aside a jury verdict finding appellee R. C. French, former Marshal of the City of St. Louis, guilty of two counts of affecting interstate commerce by extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951. For the reasons stated below, we reverse and remand to the district court with directions to vacate the judgment of acquittal and hold it for naught, to reinstate judgment of conviction pursuant to the jury verdict and to sentence appellee accordingly.

Appellee, who had been indicted by a grand jury on five counts of violating the Hobbs Act, 18 U.S.C. § 1951, and one count of violating the Federal Anti-Racketeering

Act, 18 U.S.C. §§ 1961, 1962(d), 1963, was tried before a jury which returned a verdict of guilty on two counts of violation of the Hobbs Act. Appellee had moved for acquittal at the close of the government's evidence, at which time the court reserved its ruling. After the jury's verdict, the court granted appellee's motion, vacated appellee's conviction and entered a judgment of acquittal on both counts.

In the two counts upon which the jury had found appellee guilty, he was accused of violating the Hobbs Act[1] by affecting interstate commerce through extortion under color of official right as city marshal. The district court was of the view that the government failed to prove either essential element of the crime: that appellee committed "extortion" as that act is defined under the Hobbs Act, and that the extortion affected commerce and thereby came under the coverage of federal criminal law. A failure by the government to prove either of these essential elements of the crime would entitle appellee to an acquittal. *See Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). The government, however, claims that the proof was sufficient to support a finding against appellee on both matters. Reviewing the evidence in the light most favorable to the verdict, *see United States v. Hemphill*, 544 F.2d 341 (8th Cir. 1976), *cert. denied*, 430 U.S. 967, 97 S.Ct. 1648, 52 L.Ed.2d 358 (1977), we agree that the verdict should not have been set aside.

## I. *Hobbs Act Extortion*

At the time of the alleged extortion, appellee's official duties as city marshal included collection of bail bonds which had been forfeited when a defendant failed to appear in the municipal courts to answer the charges against him. If the bond was forfeited, the surety on the bond would be required to pay to the city the amount of the bond plus court costs.

The counts upon which appellee was found guilty involved four forfeited bonds, each in the amount of $500 with $12 court costs, and each naming Claude Torrey, a professional bail bondsman, as surety. It is undisputed that appellee did not obtain the full $512 for the city in settlement of any of the four bonds; instead, appellee received from Torrey two checks payable to the city, one for $636 to settle three of the bonds and another for $262 to settle the fourth bond. Torrey testified that as a *quid pro quo* for making these settlements, appellee required an additional cash payment for his own personal benefit of $100 per bond, which Torrey paid to appellee in a lump sum of $300 cash at the time of the $636 settlement and in $100 cash at the time of the $262 settlement.

Torrey also testified that he would have been unwilling to make the cash payments but was induced to pay by appellee's offer to settle the bonds for less than $512 a piece, something appellee would not do without the cash payment.[2] According to

---

1. The Hobbs Act provides in relevant part:

   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
   (b) As used in this section—

   .   .   .   .   .

   (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
   (3) The term "commerce" means . . . all commerce between any point in a State . . . and any point outside thereof; . . .

   and all other commerce over which the United States has jurisdiction.
   18 U.S.C. § 1951.

2. The government contends that an additional factor in the extortion was appellee's failure to place Torrey's name on a "bad bond list" of bondsmen who had failed to pay the city the amount due on forfeited bonds. Were Torrey not to have made the cash payoffs to appellee, asserts the government, appellee would have placed Torrey's name on the bad bond list either for failure to pay the four bonds involved in the accusations against appellee, or some other bond defaults Torrey had failed to satisfy. However, the counts of the indictment upon which appellee was found guilty charged only that appellee had extorted the cash payments in return for failing to enforce specific bonds.

Torrey, appellee claimed to have the power to settle the bonds. Although the evidence indicated that appellee did not in fact have legal authority to settle the bonds for less than $512, it is undisputed that appellee did accept the reduced payments and took no further steps to enforce the bonds. Taking the evidence in the light most favorable to the verdict, we therefore regard it as established that appellee took personal cash payments in return for accepting reduced amounts on behalf of the city to settle defaults.

The Hobbs Act contains a definition of prohibited extortion as "the obtaining of property from another, with his consent . . . under color of official right." 18 U.S.C. § 1951(b)(2). "Extortion 'under color of official right' will . . . be established whenever evidence shows beyond a reasonable doubt 'the wrongful taking by a public officer of money not due him or his office, whether or not the taking was accomplished by force, threats, or use of fear.' " *United States v. Brown*, 540 F.2d 364, 372 (8th Cir. 1976), *citing United States v. Kenny*, 462 F.2d 1205, 1229 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). The district court concluded that this requirement had not been met, because the full sum of all money Torrey paid to appellant was less than the sum rightfully due to the sheriff's office as payment on the defaulted bonds. Under the district court's analysis, because Torrey owed $512 on each bond, any payment of up to $512 was money rightfully due the sheriff's office, even if appellee made known to Torrey that a part of the payment ($100 cash) was due to him personally as a *quid*

*pro quo* in return for settling the bond at less than the face amount. The district court concluded, "There is no theory under which the $100 cash per judgment which Torrey paid to French was not rightfully money which belonged to the City." *United States v. French*, 483 F.Supp. 523 at 524 (E.D.Mo.1980). That is, the government therefore failed to prove that appellee had taken money not due his office.[3]

We cannot agree that as a matter of law no extortion was proven. There was evidence that Torrey paid one sum of money— $212 or $262—by check to the city to settle a defaulted bond, and a second sum of money—$100—in cash to appellee as a fee for making the settlement. The jury could have believed that Torrey's debt to the city was satisfied by payment of the amount of the check which was accepted in settlement of the bond; indeed, appellee himself testified that he accepted $212 and $262 payments to settle the $512 default obligations of bondsmen. Even if appellee did not have lawful authority to make such a settlement, the evidence indicates that the city did not pursue the obligation further after the settlement was paid. If the settlement check for $212 or $262 to the city in fact put an end to appellee's obligation under the bond, the additional cash payment would not be money due appellee's office, but would be a wrongful fee not due appellee or his office. Taking the evidence in the light most favorable to the government, the jury could have concluded that appellee received a wrongful fee for himself, beyond the amount the city sought to collect.

---

Moreover, the government's brief on this point below did not present this theory and the court below did not consider it. As we disagree on other grounds with the district court's analysis of the extortion issue, we therefore do not address the "bad bond list" theory advanced by the government.

**3.** The district court characterized appellee's conduct as "embezzlement" in distinguishing the conduct from extortion under the Hobbs Act. On appeal the government argues that appellee's conduct was not embezzlement. We are concerned only with whether or not the

conduct was Hobbs Act extortion, regardless if it met the definition of some other local or common law offense, and regard the district court's discussion of embezzlement as an illustration of how the money taken by appellee could have been rightfully due appellee's office, no matter how wrongful appellee's own conduct may have been. Our disagreement with the district court is that we think the jury could have found that appellee took money not rightfully due his office, and we express no opinion on whether appellee's conduct constituted embezzlement under local law.

■ There is no doubt that Hobbs Act extortion "under color of official right" includes this kind of corrupt use of public office by the official to obtain such a wrongful personal fee. While the legislative history referring directly to the "color of official right" provision is not helpful on this point,[4] the legislative debates on the Hobbs Act suggest that Congress intended to adopt the common law definition of extortion as it had been adopted by the states, with especial reference to the law of New York, from which the Hobbs Act's language was taken. *See* 91 Cong.Rec. 11843 (remarks of Rep. Michener), 11900 (remarks of Rep. Hobbs), 11909 (remarks of Rep. Summers), 11910 (colloquy of Reps. Robeson and Springer), 11913 (remarks of Rep. Rhea), 11914 (remarks of Rep. Russell) (1945). *See also United States v. Enmons, supra,* 410 U.S. at 406 n.16, 93 S.Ct. at 1012 n.16; *United States v. Harding,* 563 F.2d 299, 302–06 (6th Cir. 1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); *United States v. Mazzei,* 521 F.2d 639, 644–45 (3d Cir.) (en banc), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *id.* at 650–55 (Gibbons, J., dissenting). *See generally* Stern, *Prosecutions of Local Political Corruption under the Hobbs Act,* 3 Seton Hall L.Rev. 1 (1971).

Appellee's conduct in this case is not meaningfully distinguishable from that found to be extortion in an old New York case, *People v. Whaley,* 6 Cow. 661 (Sup.Ct.

1827), upon which the "color of official right" language in the New York extortion statute (and thereby the Hobbs Act) was in part based. *See United States v. Mazzei, supra,* 521 F.2d at 653–54 (Gibbons, J., dissenting). *Whaley* involved the extortion conviction of a judge who had presided over an action for debt on a note. In the debt action the creditor had failed to appear in court and the case was apparently dismissed or "discontinued." However, the debtor nevertheless confessed judgment and the judge received payment in spite of the discontinuance of the debt action, an act found to be extortion. In the instant case, because the jury could have found that Torrey's check to the city put an end to his obligation to the city on the bond, Torrey's position was analogous to that of the debtor after the creditor's action had been discontinued. Nevertheless, appellee demanded additional payment from Torrey in settlement of the bond, as the New York judge had demanded payment upon the debt despite discontinuance of the action. It does not avail appellee to claim that the additional payment was a part of the full amount of Torrey's bond, any more than it would have availed the defendant in the *Whaley* case to claim that he took nothing other than money the debtor confessed to owing. In either case, the jury could have found nevertheless that the money taken was not due to the taker, whoever else

---

**4.** The only legislative history we have found for the "color of official right" language is a colloquy on the floor of the House of Representatives during debate on the predecessor of the Hobbs Act, H.R.Rep.No.653, 78th Cong., 1st Sess. (1943), which was passed by the House of Representatives but failed in the Senate. "The remarks with respect to that bill . . . are wholly relevant to an understanding of the Hobbs Act, since the operative language of the original bill was substantially carried forward into the Act." *United States v. Enmons,* 410 U.S. 396, 404–05 n.14, 93 S.Ct. 1007, 1011–12 n.14, 35 L.Ed.2d 379 (1973). During debate labor supporters expressed concern that the "color of official right" language would make it extortion for labor union officials to demand union dues. Reps. Hobbs and Summers (Chairman of the House Judiciary Committee which reported the bill) both insisted that the language applied to only *public* officials. 89 Cong.

Rec. 3228–29 (1943). The representatives saw the conduct covered by this provision as something akin to the common law crime of false pretenses. "In other words, you pretend to be a police officer, you pretend to be a deputy sheriff, but you are not." *Id.* at 3229 (remarks of Rep. Hobbs). Other comments by supporters indicated that the bill might also be construed broadly to cover "money acquired by somebody claiming to be a public officer," *id.* (remarks of Rep. Summers), a comment suggesting potential for quite broad coverage of wrongful acts by public officials or those assuming the guise of public office. The brief debate that occurred in 1943, however, was not clear enough to be determinative of the scope of the "color of official right" language, especially in light of the confusing reference to false pretenses type crimes, which would seem out of place in an extortion statute.

might have been rightfully entitled to payment. In short, appellee used his office to take money wrongfully, for appellee was not entitled to any personal fee for discharging the bond.

█ Moreover, even if the full $512 were actually due the city on each bond, it would be extortion for appellee to seek and obtain a $100 fee for himself personally as a *quid pro quo* for refraining from collecting the full amount he should have collected on the bonds. In general, a public officer who corruptly seeks a payment in return for short-changing his duty to enforce the law has committed extortion. "It matters not whether the public official induces payments to perform his duties or not to perform his duties . . . . So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of [Hobbs Act extortion]." *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). *See also United States v. Brown, supra*, 540 F.2d at 372–73 (payments by construction contractors to city building commissioner with regulatory authority over them); *United States v. Price*, 507 F.2d 1349 (4th Cir. 1974) (per curiam) (payment by property owner in return for county council member's use of influence to obtain occupancy permit for property despite building code violations); *Ladner v. United States*, 168 F.2d 771 (5th Cir.), *cert. denied*, 335 U.S. 827, 69 S.Ct. 53, 93 L.Ed. 381 (1948) (conspiracy to extort payments in return for failure to prosecute unlawful acts); *People v. Sheridan*, 186 A.D. 211, 174 N.Y.S. 327 (1919) (extortion by elevator inspector demanding payment in return for failure to report defective elevator); Annot., 70 A.L.R.3d 1153, 1160 (1976). *But see* Ruff, *Federal Prosecution of Local Corruption*, 65 Geo.L.Rev. 1171, 1174–96 (1977). In this case appellee is likewise alleged to have taken payments for himself personally in return for shortchanging his duty to the city by failing to collect the full $512 amount of the bonds. Appellee therefore would have induced payments to himself on the basis of performing or not performing his official duties. Such conduct is Hobbs Act extortion under color of official right. It makes no difference in our analysis whether appellee's duty involved collection of money or some other task. *See, e. g., United States v. Frumento*, 405 F.Supp. 23, 30–31 (E.D.Pa.1975) (indictment was sufficient to charge Hobbs Act extortion conspiracy, where revenue official sought wrongful fee in return for aid to cigarette dealer in evading taxes).

█ Such conduct is no less extortion because the "victim" may in some sense receive an economic benefit when the public official neglects his duty. *See United States v. Butler*, 618 F.2d 411 at 418 (6th Cir. 1980). *Cf. United States v. Howe*, 353 F.Supp. 419 (W.D.Mo.1973) (extortion "victim" compelled to allow vending machine on premises and to give up only part of profits to extortioner; therefore some profits were retained by the "victim"). The argument that the "victim" has suffered no loss is merely the converse of the argument that the money appellee took was part of the sum rightfully due the city. But the jury could have found that the money appellee took was a wrongful personal fee in return for reducing or failing to enforce the city's claim.

It is the wrongful purpose of the taking under color of official right that makes appellee's conduct extortion under the Hobbs Act. The Supreme Court in *United States v. Enmons, supra*, 410 U.S. at 400, 93 S.Ct. at 1009, distinguished between a case of Hobbs Act extortion by a labor union official threatening violence to obtain a personal payoff, and a case not covered by the Hobbs Act where union members threaten violence in a strike to obtain a more favorable wage settlement. Although the Court pointed out that the latter kind of strike violence may be unlawful under local law, there is no violation of the Hobbs Act where the union members threaten violence to obtain higher wage payments, a legitimate end which is not a wrongful taking of money under the Hobbs Act. By contrast, a union official does commit Hobbs Act extortion by using threats to obtain a per-

sonal payment which would *not* be a legitimate end of labor activity and which is therefore a wrongful payment. Likewise, in the instant case there was evidence that appellee obtained a wrongful payment for himself under color of office, an act analogous to a union official who took a personal payoff in return for accepting a reduced wage level in settlement of a strike. Under the *Enmons* case, the taking was wrongful for purposes of the Hobbs Act.

Furthermore, in *Enmons* special factors may have entered into the Court's consideration of strike violence by union members seeking higher benefits, for the text of the Hobbs Act and legislative history demonstrate a Congressional purpose not to restrain strike activity. *Id.* at 400–408; *see* 18 U.S.C. § 1951(c) (no implied repeal under the Hobbs Act of other federal labor laws governing strikes). Therefore, the Hobbs Act does not cover coercive action by unions in pursuit of legitimate labor goals of higher wages or increased benefits, but the Hobbs Act coverage may nevertheless extend to other kinds of wrongful taking of money to which the extortioner may also have a rightful claim. Thus, one court has held in a Hobbs Act case that the *Enmons* holding did not support a defense that the allegedly extortionate acts of the defendants, members of the Seminole Nation, were in pursuit of a rightful claim for reparations on behalf of the Nation. *United States v. Warledo*, 557 F.2d 721, 728–30 (10th Cir. 1977) (approving exclusion at trial of evidence relating to reparations claim). Under state law the rule appears to be that one who takes money extortionately cannot defend on the basis that the money collected thereby was in satisfaction of a legitimate debt. *E. g., State v. Adjustment Department Credit Bureau*, 94 Idaho 156, 483 P.2d 687 (1971); *People v. Maranian*, 359 Mich. 361, 102 N.W.2d 568 (1960); *People v. Fichtner*, 281 A.D. 159, 118 N.Y.S.2d 392 (1952), *aff'd*, 305 N.Y. 864, 114 N.E.2d 212 (1953). *See generally* Annot., 135 A.L.R. 728 (1941). Likewise, it does not justify extortion of a wrongful payment under color of official right that the payment came from one who had a legitimate debt to the government. Thus, we are convinced that the evidence could support conviction for Hobbs Act extortion in this case.[5]

## II. Effect on Commerce

The Hobbs Act does not prohibit extortion generally, but rather penalizes "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion . . . ." 18 U.S.C. § 1951(a). As the district court recognized, "[i]f the resources of a business which affects interstate commerce are depleted and diminished as a result of extortion, then interstate commerce is affected," *United States v. Rabbitt*, 583 F.2d 1014, 1023 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), and "[t]he

---

5. Appellee relies on two other cases which do not support his position. *United States v. McNeive*, 536 F.2d 1245 (8th Cir. 1976), was a mail fraud case in which a plumbing inspector took small personal payments from contractors. The evidence failed to show that the payments affected the inspector's "discretionary judgment [or] result[ed] in any official preferential treatment . . . ." *Id.* at 1251. The court stated that acceptance of the payments could not be characterized as an "extortion." *Id.* In the instant case by contrast evidence showed that the cash payments to appellee resulted in "preferential treatment" when the defaulted bonds were settled at a reduced rate.

*United States v. Adcock*, 558 F.2d 397 (8th Cir.), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977), was a Hobbs Act extortion case in which a member of a state liquor commission took kickbacks in return for inducing the commission to purchase wine from the "victim" for resale in state operated liquor stores. In holding that evidence of the "victim's" state of mind was admissible to prove that the payments were compelled by fear of economic loss, this court noted, "extortion connotes some form of coercion." *Id.* at 404. In this case appellee is charged solely with extortion under color of official right. As the court in *Adcock* recognized, this kind of extortion need not be accomplished by force, threats or use of fear. *See id.* at 403. Hence, it is irrelevant that Torrey made the cash payments to appellee voluntarily, so long as appellee was acting under color of official right. *See generally United States v. Rabbitt*, 583 F.2d 1014, 1026–28 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

connection with interstate commerce need only be slight." *Id., citing United States v. Culbert*, 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978). *See also United States v. Irali*, 503 F.2d 1295 (7th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) (effect on commerce found where payment of $150 was extorted by local official from tavern owner who purchased liquor from state distributors who in turn purchased liquor interstate).

There was no dispute that Torrey in the course of his bail bond business purchased articles, such as gasoline and certain office supplies, that had been in interstate commerce. However, the district court found that, although Torrey did purchase supplies for his bail bond business from interstate commerce, the resources available to Torrey to make such purchases were not depleted by any payments to appellee. The court reasoned that, because Torrey's total payments to the city and appellee amounted to less than the face amount of the bonds that would have been due otherwise, Torrey had *more*, not less, money to purchase items in interstate commerce as a result of his payment to appellee. On this basis, the district court held that the government failed to prove an effect on interstate commerce under a depletion-of-resources analysis.

For reversal the government argues that the Hobbs Act prohibits all extortion affecting commerce, not just extortion which has an "adverse" effect.[6] We have some difficulty with this theory. Although the Hobbs Act on its face prohibits all extortion which "in any way or degree . . . affects commerce," the legislative history of the Act strongly indicates that Congress intended to protect the free flow of commerce and prevent exaction of any unlawful tribute from interstate commerce, and indicates no Congressional intent whatsoever to punish activity absent some adverse effect on interstate commerce. *See* H.R. Rep.No.238, 79th Cong., 1st Sess. (1945), *reprinted in* [1946] U.S.Code Cong. Service pp. 1360, 1370; 91 Cong.Rec. 11839–848, 11899–922 (1945) (debate in House of Representatives on Hobbs Act). Moreover, the government's theory seems to suggest that a robbery or extortion automatically would affect commerce as long as the victim engages in transactions involving articles which have been in interstate commerce. Courts have found such an effect where the evidence shows some depletion of resources which the victim would otherwise have used in transactions involving articles which had been in interstate commerce,[7] or even in some cases where the evidence showed only a possibility that the money taken would have been used in such transactions.[8] The

6. Moreover, argues the government, Torrey's wrongful cash payments to appellee temporarily depleted Torrey's resources, even if in the long run Torrey would have had more resources because of his avoidance of his legitimate debt to the city. We do not understand how Torrey's aggregate resources were temporarily depleted by his cash payments to appellee, as the evidence indicates that Torrey settled the bonds at the time of the extortion and therefore no time interval occurred between the extortionate payment and receipt of the net financial benefit of the settlement.

7. *E. g., United States v. Blakey*, 607 F.2d 779 (7th Cir. 1979) (extortion of payments from illegal operation which used for a "front" a tire business which resold tires purchased in interstate commerce); *United States v. Richardson*, 596 F.2d 157, 161 & n.6 (6th Cir. 1979) (evidence that payments extorted from intrastate business would have been used to purchase articles from interstate commerce); *United States v. Chiantese*, 582 F.2d 974, 980 & n.16

(5th Cir. 1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979) (evidence that local parking lot used financing and articles from interstate commerce); *United States v. Irali, supra*, 503 F.2d at 1298 (evidence that extorted payments impeded ability of victim to purchase supplies which had been in interstate commerce). *Cf. Stirone v. United States, supra*, 361 U.S. at 215, 80 S.Ct. at 272 (extortionate threats against local business which used supplies from interstate commerce affected commerce because threatened interference with business would slow or stop use of supplies).

8. *See, e. g., United States v. Cerilli*, 603 F.2d 415 (3d Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980); *United States v. Staszcuk*, 517 F.2d 53 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). *But see Comment*, 66 J.Crim.L. & Criminology 306, 318–20 (1975) (arguing that because the Hobbs Act contains no legislative finding that extortion affects in-

government's theory in this case would base federal jurisdiction upon a more tenuous nexus with interstate commerce, as there was no testimony that, absent the extortion, Torrey would have spent less or more money on the articles which he regularly purchased from interstate commerce, or that failure to pay appellee off would threaten any consequences which would result in an increase or decrease in commerce.[9] The government's theory would, therefore, extend Hobbs Act coverage to any money taken by robbery or extortion from anyone who engaged in transactions involving goods which had been in interstate commerce, a reading of the Hobbs Act which in practicality would extend federal jurisdiction over just about any robbery or extortion. Such an assumption by the federal government of general jurisdiction over common law crimes traditionally covered by local law is something we would not lightly imply. *See United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971); *Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

We note, however, that there is also support for the government's position. The Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extor-

tion . . . ." *Stirone v. United States, supra,* 361 U.S. at 215, 80 S.Ct. at 272. Appellant cites cases wherein the extortionate conduct assertedly resulted in an ultimate increase in interstate commerce, as where a public official seeks a payment in return for a favorable vote that improves the "victim's" business and thereby ultimately increases interstate commerce. Perhaps the language of the Hobbs Act covering "whoever *in any way or degree* affects commerce," 18 U.S.C. § 1951(a), creates jurisdiction over all extortion with even the most indirect connection to interstate commerce. We do not need to decide in this case, however, whether or not Hobbs Act jurisdiction could be based upon such indirect effects upon commerce because there was evidence from which the jury could have concluded that Torrey's bail bond business itself was interstate commerce.

Torrey testified that he was acting as an agent for a New York insurance firm, Stiverson Insurance Company, which received a premium on the bonds he wrote.[10] Torrey further testified he wrote bonds on defendants who lived out of state and that he travelled out of state with some regularity in order to return defendants under his bonds who had fled.[11] We note that there was no proof any out-of-state firm was directly involved in the particular bonds mentioned in the counts upon which appel-

---

terstate commerce, effect upon commerce must be proven in every case and a potential effect would not be adequate to support invoking the Hobbs Act). *See also Comment,* 1972 U.Ill.L.F. 805.

9. The government at oral argument seemed to urge that, if Torrey did not pay appellee off, Torrey may have been disqualified as a bondsman for failure to satisfy his obligation under the bonds. The government seems to suggest that Torrey would then be placed on the "bad bond list," *see* note 2 *supra.* We regard this theory as speculative, for the record suggests to the contrary that Torrey would have likely paid the bonds in full if faced with no other alternative than disqualification. (Indeed there was testimony that, when appellee at one time attempted to increase the settlement totals to about $400, including both payment to the city and to appellee personally, Torrey decided to pay the whole $512 instead because income tax savings by deducting the full $512 outweighed

the savings of paying a reduced amount part of which would be a nondeductible cash payoff.) Therefore, we cannot conclude that appellee obtained the payments under an implied threat to disqualify Torrey as a bondsman and thus curtail that part of Torrey's business which involved interstate transactions. *Cf. Stirone v. United States, supra,* 361 U.S. at 215, 80 S.Ct. at 272.

10. Torrey testified that he wrote bonds as an agent for a St. Louis insurance firm. The record does not make clear if the New York firm or St. Louis firm or both firms underwrote the bonds in question in this case.

11. Torrey testified without contradiction that he wrote 6 to 8 bonds per year on out of state defendants and travelled 3 to 4 times per year out of state to apprehend bail jumpers whom he had bonded. According to Torrey, he wrote 50 to 75 bonds per year or else 2 to 3 per week.

lee was convicted and no proof of interstate activity directly relating to these particular bonds. Nevertheless the evidence does support the conclusion that the alleged extortionate payments were taken from a business regularly and substantially involved in interstate commerce, and we think this evidence sufficient to bring appellee's conduct under the coverage of the Hobbs Act.

██  Because the extortionate payments were extracted directly from an interstate enterprise, this case differs from a Hobbs Act prosecution of a public official who extorts money from a purely local enterprise, where the extortioner affects commerce by extracting funds that would have been used to purchase articles in interstate commerce. Under the Hobbs Act an indirect effect on commerce must be shown where the extortion does not directly involve an interstate enterprise. In the instant case by contrast the extortion directly affected interstate commerce, because the business from which payments were taken was itself engaged in interstate commerce. *United States v. Gates*, 616 F.2d 1103 (9th Cir. 1980); *United States v. Rabbitt, supra*, 583 F.2d at 1023; *United States v. Phillips*, 577 F.2d 495 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978); *United States v. Harding, supra*, 563 F.2d at 302; *United States v. Brown, supra*, 540 F.2d at 373; *United States v. Hathaway*, 534 F.2d 386 (1st Cir.), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). "Neither the [Hobbs Act] nor the Constitution requires that the company be engaged in an interstate transaction at the moment of the extortion to support federal jurisdiction." *United States v. Hyde*, 448 F.2d 815, 836 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). The payment cannot be hidden by an accounting trick that would demonstrate that the wrongful payment had no effect on the bottom line of the income sheet. *Id.* Whatever the significance to Torrey of the payment, the jury found that appellee took money wrongfully from an interstate enterprise.

██  Furthermore, even if we were to conceive the entire extortionate transaction as a benefit to Torrey's business, as appellee suggests, we still conclude interstate commerce was affected. The evidence indicates that Torrey did not lawfully have to make the cash payments to appellee; in some cases he went ahead and actually paid the full amount ($512) due on the bond. If appellee offered a reduced settlement of $212 or $262 to bondsmen in return for a wrongful $100 cash payment, appellee put those bondsmen willing to engage in corruption at a competitive advantage vis-a-vis any bondsman who would not make the cash payoff. By becoming involved with an enterprise in interstate commerce and creating an incentive to participation in corrupt practices, appellee affected the quality of interstate commerce if not its quantity. *Cf. United States v. Harding, supra*, 563 F.2d at 300–01 (effect on commerce where official of state real estate commission solicits payoff in return for offering to help "victim" cheat on qualifying examination for real estate brokers engaged in interstate transactions). Therefore, the moment the extortionate payment was made, there was an effect on interstate commerce, whether this effect is characterized as extraction of a wrongful tribute by a local official from an interstate enterprise, or as an infusion of corrupt practices into an enterprise whose activities reached across state lines.

Accordingly, the judgment of acquittal is reversed, and the case is remanded to the district court with directions to vacate the judgment of acquittal, reinstate the judgment of conviction based on the jury verdict, and to sentence appellee.