UNITED STATES of America, Plaintiff–Appellee–Cross–Appellant,

v.

Robert P. AGUILAR, Defendant–Appellant–Cross–Appellee.

Nos. 90–10597, 91–10024.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 18, 1993.

Decided April 19, 1994.

---

Robert D. Luskin, Beth M. Bollinger and Joseph G. Davis, Comey Boyd & Luskin, Washington, DC, Paul B. Meltzer, Peter A. Leeming, Meltzer & Leeming, Santa Cruz, CA, for defendant-appellant-cross-appellee.

Patty M. Stemler and Sara M. Lord, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee-cross-appellant.

Before: WALLACE, Chief Judge, HUG, TANG, FARRIS, PREGERSON, NORRIS, REINHARDT, BRUNETTI, KOZINSKI, LEAVY, and FERNANDEZ, Circuit Judges.

HUG, Circuit Judge:

## I.

### OVERVIEW

The appellant, United States District Judge Robert Aguilar, was charged with five criminal violations. Trial was held on August 1, 1990. He was acquitted of three of the charges, and convicted of two. The convictions were for illegally disclosing a wiretap in violation of 18 U.S.C. § 2232(c), and endeavoring to obstruct justice in violation of 18 U.S.C. § 1503. The appellant was sentenced to two six-month terms of imprisonment, to be served concurrently, and fined $2,000. Judge Aguilar appeals his convictions on both counts, and the Government appeals his sentence.

The central question in this case is whether Judge Aguilar's conduct, as charged in the indictment and found by the jury, violated the criminal statutes on which his convictions are based. We find that the statutes do not apply to the conduct at issue in this appeal, and we therefore reverse the convictions.[1]

## II.

### BACKGROUND

The genesis of the charges against Judge Aguilar was an effort by Rudy Tham, Abraham Chapman, and Edward Solomon to have Tham's 1980 conviction for embezzlement set aside.

Tham was a former union official for San Francisco Teamsters Local 856. He had been an active leader of Local 856 until his conviction on May 21, 1980, for embezzlement and making false entries into union records. District Judge Stanley A. Weigel presided over the trial. Tham desired to have his conviction overturned so that he could resume his union activity. In this regard, Tham sought the assistance of attorney Edward Solomon, and a friend, Abraham Chapman.

Solomon is an attorney whose office was located in the same building as Local 856. Twenty to thirty percent of Solomon's work came from referrals by Tham. Solomon had attended Hastings College of the Law with Judge Aguilar and was an acquaintance of the Judge.

Chapman, an 83 year-old man, was married to Mrs. Josephine Knaack ("Mrs. Knaack"), a longtime friend of the Aguilar family, whose daughter, Marilyn, had married Judge Aguilar's brother. Judge Aguilar had met Chapman at several family functions.

Solomon began working on setting aside Tham's conviction in 1987. He advised Tham that the best way to get his conviction overturned would be by filing a petition for habeas corpus under 28 U.S.C. § 2255. The petition was filed and scheduled to be heard by Judge Weigel. In an effort to enhance the chances for success, Tham, Solomon, and Chapman sought to utilize Chapman's and Solomon's ties to Judge Aguilar to solicit help and advice from Judge Aguilar. They hoped to have Judge Aguilar influence Judge Weigel in his decision on Tham's petition.

Chapman arranged a meeting between Judge Aguilar and Solomon on September 12, 1987. At the meeting, Judge Aguilar reviewed the petition and advised Solomon to seek an evidentiary hearing. After this meeting, Solomon and Chapman, at the urging of Tham, periodically called Judge Aguilar, asking him to check on the scheduling and status of the petition and the hearing. Judge Aguilar complied with the request and twice checked the court calendar to see if the hearing had been set, and once asked Judge Weigel if a hearing had been set. It is within this framework that Judge Aguilar became intertwined with Tham, Chapman, and Solomon.

In the course of investigating Tham and Chapman on unrelated matters, the FBI became aware of Tham's efforts regarding his habeas petition, and the conversations Chap-

---

1. Judge Aguilar challenges his convictions on other grounds besides the inapplicability of the statutes. He asserts that the evidence was insufficient to prove that he satisfied the knowledge requirement of either statute, and that the defini-

tion of knowledge contained in the jury instructions was erroneous. Since we reverse his convictions because the statutes do not apply to the conduct found by the jury, we have no need to reach the other issues.

man and Solomon had with Judge Aguilar. The FBI began an investigation into the events regarding Tham's habeas petition and the possible illegal attempt to influence Judge Weigel.

This investigation led to several charges being presented to the grand jury against Tham, Chapman, and Judge Aguilar, and on June 13, 1989, they were indicted.[2] In the initial trial, the three persons were tried together. This ended in a hung jury and a consequent mistrial.

Judge Aguilar was then tried separately on five counts. The charge that was the principal focus of the trial was that Judge Aguilar had participated in a conspiracy to impede criminal investigations and to influence Judge Weigel in his decisions concerning Tham's section 2255 petition. Judge Aguilar testified that he was only advising Solomon and Chapman as to how to get the matter before the court procedurally. Judge Weigel testified that Judge Aguilar did not in any way attempt to influence him in his ruling on Tham's section 2255 petition. Judge Aguilar was acquitted of the conspiracy charge and on two other charges. The jury found Judge Aguilar guilty on the two remaining charges.

Judge Aguilar was convicted on a charge of disclosing a wiretap application and a charge of attempting to obstruct justice. The nexus of these charges stems from specific incidents that occurred during the investigation relating to Tham's petition. We now turn to an analysis of the specific charges of which Judge Aguilar was convicted, and the facts involved in those charges.

## III.

### WIRETAP CHARGE

A. *Facts*

The events that led to the charge of illegal disclosure of a wiretap application are as follows.

Throughout the time that Tham was attempting to have his conviction set aside he was being investigated by the FBI as a part of a nationwide probe into health care provider fraud. On April 12, 1987, the FBI applied to then-Chief United States District Judge Robert Peckham for authorization to conduct electronic surveillance of Tham's business telephones. The application named Chapman as a potential interceptee of the wiretap.

On April 20, 1987, Judge Peckham signed an order authorizing the wiretap. The wiretap expired on May 20, 1987, and on May 21, Judge Peckham signed an order terminating the wiretap. The April 20 wiretap was never extended. Other wiretaps were authorized for which Chapman was an interceptee from September 11 to October 12, 1987, and from October 22, 1987, which was extended through May 8, 1988, by applications pursuant to 18 U.S.C. § 2518(5).

During this time, the Department of Justice of the State of California was conducting surveillance of Chapman on unrelated matters. On July 9, 1987, a state agent photographed Chapman walking out of the San Jose Federal Building with Judge Aguilar. The state agent notified the FBI. The FBI and the state agent then observed Judge Aguilar and Chapman eating lunch together.

As Chief Judge of the Northern District of California, Judge Peckham had an interest in maintaining the integrity of the court and in being informed of any matter which could damage the court's reputation. He had an arrangement with the FBI Special Agent in Charge that the agent would report to Judge Peckham any perceived improprieties occurring within the Northern District Court. Thus, on August 5, 1987, FBI Special Agent in Charge, Richard Held, informed Judge Peckham that in the course of investigating Abe Chapman, Judge Aguilar had been observed in the company of Abe Chapman. The agent informed Judge Peckham that there was no indication that Judge Aguilar was implicated in any criminal activity, or that Judge Aguilar was a subject of the investigation.

On August 9, Judge Peckham ran into Judge Aguilar at an American Bar Association reception in San Francisco. The two discussed the San Jose court calendar. Judge Peckham then told Judge Aguilar that, "in the course of a wiretap application that

---

**2.** In exchange for his cooperation with the Government, Solomon was not prosecuted.

the name Abie Chapman had come up and that [when he] had been a United States Attorney in 1951 that Abie Chapman had been prosecuted in a notorious drug case." Judge Peckham did not tell Judge Aguilar whose phone was to be tapped or whether Chapman was a person whose messages were to be intercepted. Judge Peckham testified that his intent in telling this information to Judge Aguilar was to let Judge Aguilar know that associating with Chapman could create the appearance of impropriety. Judge Aguilar responded that he knew the old man, and laughed because the Abe Chapman he knew was "a senile little old man who waddled when he walked." Judge Aguilar and Judge Peckham did not discuss Chapman or any wiretap after August 9.

Judge Aguilar testified that on February 6, 1988, Abe Chapman stopped by his house to drop off a box of sausage on behalf of Mrs. Knaack. Chapman stayed for about 10 minutes and had two brandies. Judge Aguilar walked Chapman to his car. At the car, Judge Aguilar noticed across the street a man who appeared to be conducting surveillance and taking pictures of him and Chapman. Judge Aguilar suspected the man was with the police or the FBI. Chapman then drove off almost causing an accident with two cars, one that came to a screeching halt and one that drove over the curb to miss Chapman. The car conducting surveillance followed Chapman.

The incident caused Judge Aguilar a good deal of concern. He then called his nephew, Steve Aguilar, and asked him to come over. Judge Aguilar knew that Chapman was next going to Steve's mother's house to make a delivery. He told Steve of his concerns about Chapman's driving and stated that he had heard as a fluke at work that phones were being tapped. He asked Steve to go to his mother's house and personally tell Chapman about his concerns and not to come around or call him any more. Steve went to his mother's house and conveyed the message to Chapman in person, and stated that Judge Aguilar had mentioned that Chapman's phone might be tapped. Judge Aguilar was mistaken in his belief that Chapman's phone was tapped. There was no evidence of

there ever having been an application or an order authorizing a wiretap on Chapman's phone.

■ It is from the events of February 6, 1988, that Judge Aguilar was charged and convicted of improperly disclosing a wiretap pursuant to 18 U.S.C. § 2232(c). For the following reasons, we hold that these facts do not constitute an offense under section 2232(c).

### B. *The Scope of 18 U.S.C. § 2232(c)*

Judge Aguilar was convicted of Count VI, which charged the following:

> On or about February 6, 1988, in the Northern District of California, defendant, Robert P. Aguilar while a United States District Judge, having knowledge that a Federal investigative officer had applied to the United States District Court for the Northern District of California for authorization to intercept wire communications of Abe Chapman, and in order to obstruct, impede, and prevent such interception, gave notice and attempted to give notice of the possible interception to Abe Chapman. In violation of Title 18, United States Code, Section 2232(c).

Section 2232(c) provides in part:

> *Notice of Certain Electronic Surveillance.*—Whoever, having knowledge that a Federal investigative or law enforcement officer has been authorized or has applied for authorization under chapter 119 to intercept a wire, oral, or electronic communication, in order to obstruct, impede, or prevent *such interception,* gives notice or attempts to give notice of the possible interception to any person shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 2232(c) (emphasis added).

This language requires a pending application for authorization or an authorization that has not expired. The Government argues that, under section 2232(c), it is sufficient if, at some time in the past, there was a wiretap application; it does not matter, under the Government's theory, if the wiretap application has already been denied or if authorization has been granted but has already ex-

pired. This is not a reasonable construction of the statute.

The plain language of the statute makes it clear that the purpose of the statute is to prevent interference with "possible interception." It is possible that disclosure of an existing wiretap can lead to interference with interception. It also is possible that disclosure of a pending wiretap application, if the application is subsequently authorized, can lead to interference with interception. However, disclosure of an application that already has been denied, or whose authorization already has expired, cannot possibly interfere with "such interception." The language, "such interception," shows that the statute pertains to the particular application or authorization of which the defendant has knowledge. The defendant must intend to impede an interception from the specific application or authorization of which he has knowledge.

Section 2232(c), read with the language essential to this charge, is as follows:

> Whoever having knowledge that a Federal ... officer ... has applied for ... authorization ... to intercept a wire ... communication in order to obstruct ... *such interception* gives notice or attempts to give notice of the possible interception to any person shall be fined ... or imprisoned....

(emphasis added.)

■ The statutory language is directed to disclosure of a wiretap that could possibly result from the application of which the defendant has knowledge—not from some later application, which would require a completely new justification under 18 U.S.C. § 2518(5). At the very least, this is a reasonable construction of the statute. We conclude that the Government's construction is an unwarranted expansion of the statutory language, and one which ignores the crucial phrase "such interception." However, even if the Government's interpretation were possible because of some ambiguity, the more lenient construction is required. To reject a reasonable construction of a statute is incompatible with the rule of lenity. "In interpreting the substantive ambit of criminal prohibitions, ambiguities must be resolved in favor of the criminal defendant." *United States v. Bax-*

*ley,* 982 F.2d 1265, 1270 (9th Cir.1992); *see United States v. Batchelder,* 442 U.S. 114, 121, 99 S.Ct. 2198, 2202, 60 L.Ed.2d 755 (1979); *Simpson v. United States,* 435 U.S. 6, 14, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978). The plain language of the statute is clear, but even if it were possible to arrive at the Government's construction out of some ambiguity in the statute, it would violate the rule of lenity to do so.

■ Furthermore, there is no indication that the statute's primary concern is with the giving of notice with specific intent to interfere with surveillance in general, as the Government contends. The statute does not impose liability on a defendant who interferes with "any future surveillance" or "any future wiretap." Rather, it imposes liability on a defendant who has knowledge of a particular wiretap application or authorization and who gives another person notice of "*the possible interception*" in an effort to obstruct "*such interception.*" *See* 18 U.S.C. § 2232(c). The Government's interpretation that the statute applies to interference with future surveillance does not accord with the plain language of the statute.

■ The Government relies on an isolated phrase in a Senate Committee Report to construe the statute as applying to applications for wiretaps that have expired. In interpreting a federal statute, we seek to determine the intent of Congress. The primary indication of that intent is the language of the statute. It is only if the language is unclear that we refer to legislative history as an aid to the statutory interpretation. *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *United States v. Koyomejian,* 970 F.2d 536, 543 (9th Cir.) (Kozinski, J., concurring), *cert. denied,* ─── U.S. ───, 113 S.Ct. 617, 121 L.Ed.2d 550 (1992); *Haynes v. United States,* 891 F.2d 235, 238 (9th Cir.1989). In this case, we conclude that the language of the statute clearly expresses the congressional intent. Furthermore, the language of the statute is consistent with the purpose of the Electronic Communications Act, as expressed in the Senate Report, which is "to protect against the unauthorized interception of electronic

communications," so as to further "guard against the arbitrary use of Government power to maintain surveillance over citizens...." S.Rep. No. 541, 99th Cong., 1st Sess. 1, (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555. (Volume 5.)

 First Amendment considerations also militate against the Government's construction of section 2232(c). Statutes must be construed, if fairly possible, to avoid constitutional problems. *See Communications Workers of America v. Beck,* 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988); *United States ex rel. Madden v. General Dynamics,* 4 F.3d 827, 830 (9th Cir. 1993). According to the Government, section 2232(c) bars the disclosure of wiretap applications for an indefinite period of time. However, it is unlikely that the Government would be able to assert the necessary compelling interest[3] in barring disclosure of a wiretap application many months or years after the fact, since the possibility that such disclosure would lead to the obstruction of an existing wiretap is extremely slim. Moreover, the impact on First Amendment interests could be substantial. The suppression for an indefinite period of information regarding politically-motivated wiretaps, such as those that occurred at the height of the civil rights movement, could not only impede free speech but could obstruct efforts to correct past government misconduct and to avert similar abuses of power in the future. Our concern that section 2232(c), as construed by the Government, might reach a "substantial amount of constitutionally protected conduct" thus reinforces our more limited interpretation of the statute. *See United States v. Hutson,* 843 F.2d 1232, 1234 (9th Cir.1988) (setting out test for First Amendment overbreadth challenge) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982)).

 The Government argues that the existence of a wiretap or pending application is unnecessary because the statute criminalizes attempts. Thus, the Government maintains, an attempt to obstruct the interception of a wire communication is sufficient for a conviction, as long as the defendant knows of a wiretap application or authorization and discloses it, whether or not such an application or authorization in fact still exists at the time of disclosure.

Section 2232(c) is not a classic attempt statute. The classic attempt statute criminalizes an attempt to violate *another* statute or *another* statutory subsection. *See, e.g.,* 18 U.S.C. § 1113 (1988) (criminalizing an attempt to commit murder or manslaughter; murder criminalized by 18 U.S.C. § 1111 (1988) and manslaughter criminalized by 18 U.S.C. § 1112 (1988)); 18 U.S.C. § 1201(d) (1988) (criminalizing an attempt to violate 18 U.S.C. § 1201(a)(4) (1988), which prohibits the kidnapping of foreign officials). There is not a statute that criminalizes attempts to violate section 2232(c), and section 2232(c) does not criminalize an attempt to violate another statute or statutory subsection.

Section 2232(c) itself punishes someone who "gives notice *or attempts* to give notice" of possible interception (emphasis added). A reading of the statute demonstrates that the word "attempt" modifies only the words "to give notice." There is no modification of the requirement of a possible interception. In order for a statutory violation to occur under section 2232(c), the element of "possible interception" must be met. Thus, the wiretap must be in existence or there must be a pending application or authorization. As we have discussed, actually giving notice of an expired wiretap authorization or application is not a violation of section 2232(c); *a fortiori* an *attempt* to give notice of an expired authorization or application cannot be a violation of the statute. Thus, the attempt aspect of the statute is not involved in this case. The issue in this case is not whether Judge Aguilar attempted to disclose prohibited wiretap information, but whether the wiretap information he did disclose was prohibited.

The Government relies on *United States v. Russell,* 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed.

---

**3.** *See Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989).

553 (1921), and *United States v. Zemek*, 634 F.2d 1159 (9th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981), to support its argument that § 2232(c) bars the attempted disclosure of an expired wiretap. The statute at issue in *Russell* criminalized improperly influencing or endeavoring to influence "any ... juror." 255 U.S. at 140, 41 S.Ct. at 260. Although the indictment did not state that the person whom the defendant approached had actually been selected to be a juror, the court ruled the omission immaterial. *Id.* at 143, 41 S.Ct. at 261. It held that a person who has been summoned for jury service at the defendant's trial but has not yet been selected or sworn *is* a "juror" for purposes of the statutory provision involved. In *Zemek*, where the statute covered obstructing or endeavoring to obstruct the communication of information to a criminal investigator, we found it irrelevant that the criminal investigation had already terminated. 634 F.2d at 1176–77. We held that the statute did not provide that an investigation must be in progress, only that the defendant must have obstructed or attempted to obstruct communications to an investigator. We then found that the proof necessary to satisfy the statutory requirement that the intended recipient of the communication be an "investigator" was unchallenged. *Id.* at 1177 n. 22. *Russell* and *Zemek* are distinguishable from this case.

The critical difference between *Russell* and *Zemek*, on the one hand, and the case before us, on the other, is evident. In both of the earlier cases, the obstruction related to an entity that *actually existed* at the time of defendant's criminal action—in *Russell*, the court found that there was a "juror" *in esse*, in *Zemek*, the court held that there was an actual "investigator." Here, the Government urges an entirely opposite theory: that the statute is violated by the attempted disclosure of an entity that *does not exist*, i.e., a wiretap that has *expired*.

■ The dissent argues that it is irrelevant whether interception was objectively possible or not, in short, that factual impossibility is not a defense. The present case, however, involves not just factual impossibility, but legal impossibility. It is the latter which is dispositive here. The doctrine of legal impossibility has been a part of criminal law for centuries. *See R. v. Carr*, 168 Eng. Rep. 854 (1819) (defendant acquitted on grounds of legal impossibility). Where legal impossibility exists, there can be no violation of a statute. An example of legal impossibility may be seen if we change one basic fact in *Russell*. Specifically, in *Russell*, had there been no trial contemplated at all, and thus no possible jurors to attempt to influence, it would have been legally impossible for the defendant to have committed a statutory violation. Similarly, no matter what "concrete action" a defendant may take, if no wiretap exists or is currently authorized and if there is no pending application, there is no way that the defendant can obstruct or attempt to obstruct the possible interception of a wiretap. In short, in the case before us, because the wiretap had expired at the time Judge Aguilar acted, no violation of section 2232(c) occurred.

The fact that other wiretaps were subsequently authorized on the telephones of a number of individuals, including the individual whose phone had been tapped under the April 20 authorization, cannot save the Government's case. The statute prohibits disclosure of a wiretap of which a defendant has knowledge.[4] The only application about which Judge Aguilar had any knowledge was the application mentioned by Judge Peckham. This application had resulted in the authorization to tap Rudy Tham's telephone and had expired by the time Judge Peckham spoke to Judge Aguilar. Therefore, there was no possibility that Judge Aguilar by any notification could have impeded an interception authorized as a result of that application.

For the above reasons, we conclude that the record in this case fails to establish that Judge Aguilar violated 18 U.S.C. § 2232(c).

## IV.

### OBSTRUCTION OF JUSTICE CHARGE

Judge Aguilar was convicted on Count Eight of the indictment, which stated:

---

4. Under the statute, knowledge of an application for or authorization of the wiretap satisfies the scienter requirement.

1. At all times relevant to this count of the indictment, defendant AGUILAR was aware that a federal grand jury in the Northern District of California was investigating possible violations of federal criminal law by ROBERT P. AGUILAR, Abe Chapman, Michael Rudy Tham, and others.

2. On or about June 22, 1988, defendant ROBERT P. AGUILAR, while a United States District Judge, did corruptly endeavor to influence, obstruct, and impede the aforementioned grand jury investigation, and thus the due administration of justice in the Northern District of California, by making false and misleading statements to Special Agents of the Federal Bureau of Investigation concerning defendant AGUILAR's assistance to Michael Rudy Tham and concerning defendant AGUILAR's knowledge and disclosure of information concerning court-ordered electronic surveillance of Abe Chapman.

In violation of Title 18, United States Code, Section 1503.

### A. *Facts*

▮ The facts that led to the obstruction of justice charge are as follows.

In the course of the FBI investigation of the possible attempt to influence Judge Weigel in ruling on Tham's petition, the FBI agents decided to interview Judge Aguilar to determine the extent of his involvement in the matter.

They asked Judge Aguilar questions about his involvement with Chapman and Solomon concerning Tham's petition, and about his knowledge of a wiretap and what he told Chapman. The jury found that some of his responses were false and misleading.

### B. *The Scope of 18 U.S.C. § 1503*

We reverse the conviction of endeavoring to obstruct justice because the conduct charged in the indictment and found by the jury does not constitute a violation of section 1503. The jury found that Judge Aguilar, as a target of the investigation, made false and misleading statements to the FBI agents, minimizing his involvement with Chapman

and attorney Solomon. Conduct of this nature is governed not by section 1503 but by 18 U.S.C. § 1001 (1988), which concerns false statements to federal agencies. Judge Aguilar was not charged with a violation of section 1001. Furthermore, even under a section 1001 charge, the statute does not apply to certain situations where a truthful response would have incriminated the declarant. This is known as the "exculpatory no" doctrine. We explained the application of section 1001 and the "exculpatory no" doctrine in *United States v. Equihua–Juarez,* 851 F.2d 1222, 1224 (9th Cir.1988).

In the case before us, Judge Aguilar is charged with obstructing justice under section 1503, which provides:

**3. Influencing or injuring officer or juror generally**

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, *or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice,* shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1503 (emphasis added). The underscored part of this statute is often referred to as the "omnibus clause," and it is the part of the statute that Judge Aguilar is alleged to have violated.

This statute requires the obstruction of a judicial proceeding, not simply an FBI investigation. The judicial proceeding he is

charged with obstructing is a grand jury investigation of a conspiracy involving himself and others. There is no evidence that Judge Aguilar coerced, intimidated or attempted to persuade the FBI agents to testify falsely before the grand jury. Instead, at trial the jury found that he misled the FBI about the extent of his contacts with Chapman and Solomon. This does not constitute the crime of obstructing justice under section 1503.

We have interpreted section 1503 as extending only to interference with a pending judicial proceeding. *United States v. Brown*, 688 F.2d 596, 598 (9th Cir.1982). Interference with a government agency's investigation is insufficient. *Id.* There is no evidence that a grand jury had authorized or directed the FBI investigation; nor is there evidence that the FBI agents had been subpoenaed to testify. The conduct alleged was interference with an FBI investigation, not a judicial proceeding. The fact that the FBI investigation could result in producing evidence that might be presented to a grand jury is insufficient to constitute a violation of section 1503.

To construe the statute as the Government has in this case would mean that anyone who makes a false statement to any person who might be or is expected to be a witness before a grand jury or any other judicial proceeding about a subject under investigation could be guilty of the crime of obstructing justice. Other statutory sections safeguard against misinformation to a grand jury. False testimony before a grand jury is punishable as perjury. Causing a witness knowingly to testify falsely is suborning per-

jury. This obstruction of justice statute was not intended to extend to the facts of this case.

In analyzing Congress's intended application of section 1503, a brief history of the section is enlightening. Section 1503, as it was originally enacted in 1948, specifically proscribed certain conduct seeking to influence witnesses, as well as judicial officers and jurors, in judicial proceedings. The title of the section, as well as the body, indicated that the statute was intended to cover judicial officers, jurors, and witnesses. The full text of the statute is set forth in the margin.[5] In 1982, Congress enacted the Victim and Witness Protection Act, 96 Stat. 1248 (1982). This new statute removed all references to witnesses in section 1503 and enacted a new section 1512, addressed specifically to the influencing of witnesses, victims, and informants. The Second Circuit in *United States v. Hernandez*, 730 F.2d 895, 899 (2d Cir. 1984), stated in its conclusion that section 1512 replaced that part of section 1503 that pertained to witnesses. The *Hernandez* case involved a threat to kill a witness, and the court held that the charge could not be sustained under section 1503. *Id.*

Our court faced a charge of witness tampering under somewhat difference circumstances in *United States v. Lester*, 749 F.2d 1288 (9th Cir.1984). The facts in the *Lester* case involved the hiding and bribing of a witness in order to prevent him from testifying in a criminal trial. We disagreed with the broad statement of the Second Circuit in the *Hernandez* case that "[C]ongress affirmatively intended to remove witnesses en-

5. **1503. INFLUENCING OR INJURING OFFICER, JUROR OR WITNESS GENERALLY**

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other

committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both. 62 Stat. 769 (1948).

tirely from the scope of § 1503." *Id.* at 1295 (internal quotation omitted). We distinguished *Hernandez,* noting that it dealt with intimidation and harassment of a witness, whereas *Lester* involved non-coercive witness tampering. We observed that section 1512 did not encompass such non-coercive conduct and, thus, concluded that this conduct still remained punishable under the omnibus clause of section 1503. *Id.* at 1295–96.

In 1986, the Second Circuit dispelled any doubts about what was meant by the *Hernandez* opinion, stating that section 1512 was intended to completely supplant the portion of section 1503 that dealt with witnesses. *United States v. Jackson,* 805 F.2d 457, 461 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). This presented a clear conflict with our *Lester* case.

In 1988, Congress obviated this conflict between the Ninth and Second Circuits by amending section 1512 to cover specifically non-coercive witness tampering. This eliminated the problem that we discussed in *Lester.* [6] Section 1512, as it read at the time of our decision in *Lester,* was limited to witness tampering by a person who accomplished it or attempted to accomplish it through intimidation, physical force, threats or misleading conduct. This left non-coercive witness tampering untouched unless it could be classified as "misleading conduct." The 1988 amendment to section 1512 inserted the phrase "or corruptly persuades" within the proscribed conduct, thus providing for non-coercive witness tampering. The pertinent part of section 1512 as amended is as follows:

> (b) Whoever knowingly uses intimidation or physical force, threatens, *or corruptly persuades* another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
>
> (1) influence, delay, or prevent the testimony of any person in an official proceeding;

. . . .

> shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

This amendment was adopted November 18, 1988, approximately five months after the conduct forming the basis for the charge against Judge Aguilar occurred. Thus, in our circuit, under the authority of the *Lester* opinion, non-coercive witness tampering was still covered under the omnibus clause of section 1503.[7]

The importance of the legislative history to this case is that in removing the conflict between the Ninth Circuit and the Second Circuit, Congress indicated what type of non-coercive conduct was meant to be proscribed with regard to witnesses. It is conduct that *"corruptly persuades ... or attempts to do so "* in order to influence or prevent the testimony of any person in an official proceeding.

In order to sustain a conviction under the omnibus clause of section 1503, it must be found that Judge Aguilar's actions "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice." Congress's translation of this requirement as it pertains to witnesses, by its amendment to section 1512, indicates that the conduct must involve a defendant who "corruptly persuades ... or attempts to [persuade]" a witness so as to influence his testimony.

■ If a person sought to influence the testimony of a witness by bribery or extortion, this would clearly fall within the normally accepted meaning of corrupt. Simply making a false statement to a potential witness is a far cry from any generally accepted meaning of "corrupt influence" or "corrupt

---

**6.** The Second Circuit in *United States v. Masterpol,* 940 F.2d 760, 763 (2d Cir.1991), observed that the 1988 amendments "diminished significantly" the force of the *Lester* precedent. Perhaps, more fundamentally, it could be stated that

the problem we saw in *Lester* was alleviated by Congress.

**7.** In view of the result we reach, it is unnecessary to revisit the question of whether *Lester* was correctly decided.

persuasion." [8] To place in contrast the type of conduct that would be corrupt influence, consider the following hypothetical fact situation: FBI agents go to a judge, state that they have done an investigation, and reveal certain facts that they intend to relate to a grand jury, which indicate that the judge had engaged in a conspiracy to influence another judge. If the defendant judge appeals to them not to so testify because it would harm his career, offers them a bribe not to testify, or threatens that he will see that they lose their jobs if they testify—that would amount to an attempt to corruptly influence the FBI agents to change their testimony.

There is no evidence that Judge Aguilar tried to tell the FBI how to testify, tried to persuade them not to testify, or tried to dissuade them from testifying as to what their investigation otherwise revealed. The only evidence is that he made false and misleading statements to the FBI regarding his contacts with Chapman and Solomon. This is very different from the other types of activities enumerated in section 1503.[9]

There is a significant difference between making a false statement to a potential witness and trying to persuade a witness to change his or her testimony through threats, force, bribery, extortion or other means of corrupt persuasion. Under our past case law, *only* section 1001 has ever covered simple false statements. Prior to its 1988 amendment, section 1503 extended to persuading a witness to tell a false story (*see United States v. Gates,* 616 F.2d 1103, 1105,

1107 (9th Cir.1980)); the amendment explicitly shifted the prohibition on such "corrupt persuasion" of a witness to section 1512. At no point, however, has this court interpreted either section 1503 or section 1512 as barring the making of a false and misleading statement to a potential grand jury witness. Instead, Congress's use of the phrase "or corruptly persuades" is consistent with our past case law, corroborating our reliance on that later statutory language as a guide to interpreting the pre-amendment section 1503.

Construing section 1503 so broadly as to cover making false and misleading statements to FBI agents would implicate the Fifth Amendment concerns underlying the exculpatory no doctrine of section 1001. *Cf. United States v. Alzate–Restreppo,* 890 F.2d 1061, 1068 (9th Cir.1989) (Patel, J., concurring, joined by D.W. Nelson, J.); *United States v. Lambert,* 501 F.2d 943, 946 n. 4 (5th Cir.1974) (exculpatory no doctrine stems from judges' "latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment"). Thus, interpreting section 1503 as overlapping with section 1001 would at the very least require us to engraft the exculpatory no doctrine onto section 1503.

If "corruptly influence" is extended to mean "making false statements to a potential witness," we will have expanded the statute far beyond its reasonable construction. If for no other reason, the rule of lenity would preclude such a construction. As we discussed in connection with the wiretap charge,

8. We find *United States v. Poindexter,* 951 F.2d 369 (D.C.Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992), most helpful on this point. In that case the D.C. Circuit held that the term "corruptly," as used in 18 U.S.C. § 1505, was unconstitutionally vague as applied to Poindexter's false statements to Congress. The court's interpretation of section 1505 was based on section 1503, since the language of section 1505, including its "omnibus clause," was borrowed from section 1503.

The *Poindexter* court found that while the defendant's false statements violated section 1001, they were not obviously encompassed within section 1505's prohibition against corruptly influencing, obstructing or impeding a congressional inquiry. The court found that the term corruptly—although "at least as used in § 1503, ... is something more specific than simply 'any' immoral method used to influence a proceed-

ing,'"—did not give constitutionally sufficient notice that it prohibited false statements to Congress. *Poindexter,* 951 F.2d at 382, 386. Our construction of section 1503 renders this constitutional inquiry unnecessary, but we note that the constitutional issue raised and decided adversely to the Government in *Poindexter* is nearly identical to the issue that is present here and that we would be required to conduct the same analysis as the D.C. Circuit were we to construe the statute in the manner urged by the prosecution.

9. *See United States v. Ryan,* 455 F.2d 728, 733 (9th Cir.1972) (stating that under the "omnibus clause" of section 1503, "[t]he offense charged must be similar to those specified in the statute, applying the doctrine of *ejusdem generis* ") (citing *United States v. Essex,* 407 F.2d 214 (6th Cir. 1969)).

in interpreting a criminal statute, where there is possible ambiguity, the more lenient construction is required. *United States v. Baxley,* 982 F.2d 1265, 1270 (9th Cir.1992).

For the above reasons we conclude that the record in this case fails to establish that Judge Aguilar violated 18 U.S.C. § 1503.

## V.

### CONCLUSION

We reverse the convictions on both Counts VI and VIII because neither section 2232(c) nor section 1503 extends to the facts of this case. Consequently, we do not reach Judge Aguilar's contention that an erroneous knowledge instruction compels reversal nor the Government's cross-appeal contending that the district judge erred in sentencing.

**REVERSED.**

FERNANDEZ, Circuit Judge, in which WALLACE, Chief Judge, joins, concurring and dissenting:

I concur in the majority's opinion regarding Count Eight. However, I must respectfully dissent as to Count Six. In my opinion, 18 U.S.C. § 2232(c) does cover Judge Aguilar's actions. As I see it, the government was required to prove that Judge Aguilar knew that a wiretap had been applied for; that Judge Aguilar intended to obstruct or impede the interception for which the application was designed to obtain authorization; and that Judge Aguilar gave or attempted to give notice of the possible interception.

For purposes of this opinion, I (along with the majority) will take it as a given that Judge Aguilar knew of the wiretap application.[1] I also take it that he even knew that a wiretap might well result from that application.[2] I further take it that he did not know about the later applications and wiretaps, including the one which was in place when he made his disclosures to Chapman, although the latter assumption is somewhat problematic. He certainly talked and behaved as if he thought a wiretap *was* in place.

It cannot be doubted that Judge Aguilar conveyed information to Chapman with the intent to impede interception. We need not be concerned with whether he thought that the initial wiretap authorizations were extended or thought something else. We need only take him at his word. He did think that the information disclosed to him meant that Chapman's conversations were being intercepted by a wiretap.

That leaves only the question of whether Judge Aguilar could have attempted "to give notice of the possible interception." 18 U.S.C. § 2232(c) (West Supp.1993). The majority reads this to mean that an interception must have been objectively possible at the time the notice was given or at the time that the attempt to give notice was made. I believe that is a strange way to read the statute. To my mind, the statute must be read to mean that a defendant has fulfilled this element upon attempting to warn someone that an interception of that person's telephone communications is possible. Here the defendant, Judge Aguilar, was correct. Interception *was* then possible. But that is not the point. The point is that Judge Aguilar's own wrongdoing was his attempt to give a notice that would interfere with a wiretap. Here his attempt to interfere could have gone awry for any of a number of reasons. His nephew might not have conveyed his message. The telephone lines could have come down while he was calling a target. The wiretap might not have been in place; indeed, there never was a wiretap on Chapman's own telephone. Chapman may no longer have been targeted. The authorization itself might not have been granted pending further information. The wiretap might have expired. Etc.

Of course, Judge Aguilar's concrete action was the notice he gave or attempted to give. That is the only thing that went beyond mental states—knowledge, intent, belief that interception was possible, and belief that interception could be obstructed. When a defendant tries to give notice, we can be sure

---

1. His conversation with Judge Peckham indicates that.

2. Indeed, in his conversation with Solomon he said, "Oh yeah the phone's definitely tapped.... Absolutely."

that we are not punishing thoughts alone. Rather, his wrongdoing becomes manifest, just as it did here. Judge Aguilar matched his actions to his thoughts. He attempted to give notice of the possible interception of Chapman's conversations.

It seems to me that the statute is clear enough on this point to make resort to legislative history unnecessary. *See United States v. Galliano,* 977 F.2d 1350, 1352 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1399, 122 L.Ed.2d 772 (1993). But if we do so resort, any doubt is removed by two salient comments in the brief Senate Report. *See* S.Rep. No. 541, 99th Cong., 1st Sess. 1, 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3588.[3] That report indicates an intent to punish conduct which gives notice of the possible interception to someone who *was* a target. *Id.* Use of the past tense shows that the person may no longer be a target, so that no interception would remain possible in the objective sense. More importantly, the report states that "[t]he offense also includes an attempt to engage in the offense." *Id.* At the very least, Judge Aguilar made that attempt. He did his very best to obstruct any possible interception of Chapman's telephone conversations.

I am not unaware of the rule of lenity, but it should only be applied when there is some "grievous ambiguity or uncertainty" which cannot be overcome. *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991). There is no such ambiguity here. Perhaps in saying that I show too much temerity in the face of the majority opinion. However, I cannot find opacity where a straight-forward reading of the statute gives fair warning to the citizen of what is required to violate its terms. I believe that to be the case here. I do not think one has to try to convert dross into precious metal in order to reach this conclusion; rather, I think that by some exercise of thaumaturgy gone awry, the majority has turned gold into lead. Judge Aguilar "knew" of the application, intended to impede the interception which would flow from that ap-

plication, and told Chapman that it was possible that his conversations would be intercepted. That is all the government had to prove.

I refrain from discussing the other issues that would have to be wrestled with before actually affirming Judge Aguilar's conviction, such as the meaning of knowledge. Given the majority opinion, that discussion would encumber the reports without deciding anything.

In sum, I agree with the majority that Judge Aguilar's conduct cannot lead to a conviction under 18 U.S.C. § 1503, but I believe that it could, and properly did, lead to a conviction under 18 U.S.C. § 2232(c).

---

**3.** The House Report is to the same effect. *See* H.R.Rep. No. 99–647, 99th Cong., 2d Sess., at 61